TCHEREPNIN ET AL. *v.* KNIGHT ET AL.

No. 104.   Argued November 13, 1967.—Decided December 18, 1967.

*Arnold I. Shure* argued the cause for petitioners.  With him on the briefs were *Anthony Bradley Eben, Solomon Jesmer* and *Robert A. Sprecher.*

*Stuart D. Perlman,* Assistant Attorney General of Illinois, argued the cause for respondents Knight et al. With him on the brief were *William G. Clark,* Attorney General, *Richard E. Friedman,* First Assistant Attorney General, and *John J. O'Toole,* Assistant Attorney General. *Charles J. O'Laughlin* argued the cause for respondents City Savings Association et al.  With him on the brief was *Albert E. Jenner, Jr. Kinsey T. James* filed a memorandum for respondent Mensik.

*Philip A. Loomis, Jr.,* argued the cause for the Securities and Exchange Commission, as *amicus curiae,* urging reversal.  With him on the briefs were *Solicitor General Griswold, Ralph S. Spritzer, David Ferber* and *Richard E. Nathan.*

Opinion of the Court by MR. CHIEF JUSTICE WARREN, announced by MR. JUSTICE BRENNAN.

The narrow question for decision in this case is whether a withdrawable capital share in an Illinois savings and loan association is a "security" within the meaning of the Securities Exchange Act of 1934, 48 Stat. 881, 15 U. S. C. § 78a *et seq.*

The petitioners are a number of individuals holding withdrawable capital shares in City Savings Association of Chicago, a corporation doing business under the Illinois Savings and Loan Act.[1] On July 24, 1964, they filed a class action [2] in the United States District Court for the Northern District of Illinois, alleging that the sales of the shares to them by City Savings were void under § 29 (b) of the Securities Exchange Act of 1934, 15 U. S. C. § 78cc (b), and asking that the sales be rescinded. Named as defendants in the complaint were City Savings, its officers and directors, two state officials who had taken custody of the Association,[3] and three individuals named as liquidators by the Association's shareholders in voting a voluntary plan of liquidation.[4] The complaint alleged that the withdrawable capital shares purchased by the petitioners were securities within the meaning of § 3 (a) (10) of the Securities Exchange Act,[5] that the petitioners had purchased such securities in reliance upon printed solicitations received from City Savings through the mails, and that such

---

[1] Ill. Rev. Stat., c. 32, §§ 701–944.

[2] The members of the class were identified in the complaint as "more than 5,000 investors [who] have purchased securities [i. e., withdrawable capital shares] of City Savings since July 23, 1959 . . . ." The total investment of the class members was alleged to amount to "between fifteen and twenty million dollars."

[3] The state officials had acted under the authority of Ill. Rev. Stat., c. 32, § 848. The record does not disclose the precise reason for placing City Savings under state custody. However, the complaint filed in the District Court and the petitioners' brief in this Court suggest that City Savings has been the victim of mismanagement of major proportions.

[4] The voluntary plan of liquidation was formally approved four days after the petitioners had filed their complaint. However, the three liquidators had been nominated prior to the filing of the complaint, and their election had been a foregone conclusion. Voluntary liquidation is authorized by Ill. Rev. Stat., c. 32, Art. 9.

[5] 15 U. S. C. § 78c (a) (10).

solicitations contained false and misleading statements in violation of § 10 (b) of the Securities Exchange Act [6] and of Rule 10b-5 adopted thereunder by the Securities and Exchange Commission. [7] More specifically, the complaint alleged that the mailed solicitations portrayed City Savings as a financially strong institution and its shares as desirable investments. But the solicitations failed to disclose, *inter alia,* that the Association was controlled by an individual who had been convicted of mail fraud involving savings and loan associations, that the Association had been denied federal insurance of its accounts because of its unsafe financial policies, and that the Association had been forced to restrict withdrawals by holders of previously purchased shares.

The respondents filed motions to dismiss on the ground that the complaint failed to state a cause of action under § 10 (b) because the petitioners' withdrawable capital shares were not securities within the meaning of the Securities Exchange Act. The District Court denied the motions to dismiss, ruling that the petitioners' shares fell within the Act's definition of securities. However, recognizing that the ruling "involves a controlling question of law as to which there is substantial ground for difference of opinion," the District Court certified its order for an interlocutory appeal to the Court of Appeals for the Seventh Circuit under 28 U. S. C. § 1292 (b). The Court of Appeals, with one judge dissenting, agreed with respondents that the withdrawable capital shares issued by City Savings did not fit the definition of securities in § 3 (a)(10) of the Securities Exchange Act. Consequently, it ruled that the District Court was without jurisdiction in the case, and it remanded with instructions to dismiss the com-

---

[6] 15 U. S. C. § 78j (b).

[7] 17 CFR § 240.10b-5.

plaint. 371 F. 2d 374. Because this case presents an important question concerning the scope of the Securities Exchange Act, we granted certiorari. 387 U. S. 941. We disagree with the construction placed on § 3 (a)(10) by the Court of Appeals, and we reverse its judgment.

Section 3 (a)(10) of the Securities Exchange Act of 1934 provides:

"3. (a) When used in this title, unless the context otherwise requires—

. . . . .

"(10) The term 'security' means any note, stock, treasury stock, bond, debenture, certificate of interest or participation in any profit-sharing agreement or in any oil, gas, or other mineral royalty or lease, any collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit, for a security, or in general, any instrument commonly known as a 'security'; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, or warrant or right to subscribe to or purchase, any of the foregoing; but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited."

This case presents the Court with its first opportunity to construe this statutory provision. But we do not start with a blank slate. The Securities Act of 1933 (48 Stat. 74, as amended) contains a definition of security [8]

---

[8] "2. When used in this title, unless the context otherwise requires—
"(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or

virtually identical to that contained in the 1934 Act. Consequently, we are aided in our task by our prior decisions which have considered the meaning of security under the 1933 Act.[9] In addition, we are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes. The Securities Exchange Act quite clearly falls into the category of remedial legislation.[10] One of its central purposes is to protect investors through the requirement of full disclosure by issuers of securities, and the definition of security in § 3 (a)(10) necessarily determines the classes of investments and investors which will receive the Act's protections. Finally, we are reminded that, in searching for the meaning and scope of the word "security" in the Act, form should be disregarded for substance and the emphasis should be on economic reality. *S. E. C.* v. *W. J. Howey Co.*, 328 U. S. 293, 298 (1946).

Because City Savings' authority to issue withdrawable capital shares is conferred by the Illinois Savings and Loan Act, we look first to the legal character imparted to those shares by that statute. The issuance of with-

---

participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security'. . . ." 48 Stat. 905.

[9] *S. E. C.* v. *United Benefit Life Ins. Co.*, 387 U. S. 202 (1967); *S. E. C.* v. *Variable Annuity Life Ins. Co.*, 359 U. S. 65 (1959); *S. E. C.* v. *W. J. Howey Co.*, 328 U. S. 293 (1946); and *S. E. C.* v. *C. M. Joiner Corp.*, 320 U. S. 344 (1943).

[10] The Securities Exchange Act was a product of a lengthy and highly publicized investigation by the Senate Committee on Banking and Currency into stock market practices and the reasons for the stock market crash of October 1929. See Loomis, The Securities Exchange Act of 1934 and the Investment Advisers Act of 1940, 28 Geo. Wash. L. Rev. 214, 216–217 (1960).

drawable capital shares is one of two methods by which Illinois savings and loan associations are authorized to raise capital.[11]  City Savings' capital is represented exclusively by withdrawable capital shares.  Each holder of a withdrawable capital share becomes a member of the association [12] and is entitled to "the vote of one share for each one hundred dollars of the aggregate withdrawal value of such accounts, and shall have the vote of one share for any fraction of one hundred dollars." [13]  The holders of withdrawable capital shares are not entitled to a fixed rate of return.  Rather, they receive dividends declared by an association's board of directors and based on the association's profits.[14]  The power of a holder of a withdrawable capital share to make voluntary withdrawals is restricted by statute.[15]  While withdrawable capital shares are declared nonnegotiable and not subject to Article 8 of the Uniform Commercial Code,[16] such shares can be transferred "by written assignment accompanied by delivery of the appropriate certificate or account book." [17]

While Illinois law gives legal form to the withdrawable capital shares held by the petitioners, federal law must govern whether shares having such legal form constitute

---

[11] "The capital of an association may be represented by withdrawable capital accounts (shares and share accounts) or permanent reserve shares, or both . . . ."  Ill. Rev. Stat., c. 32, § 761 (a). "Permanent reserve shares shall constitute a secondary reserve out of which losses shall be paid after all other available reserves have been exhausted . . . ."  *Id.*, § 763.

[12] *Id.*, § 741 (a)(1).

[13] *Id.*, § 742 (d)(2).  Each borrower from a savings and loan association automatically becomes a member of the association, *id.*, § 741 (a)(2), but is entitled to only one vote, *id.*, § 742 (d)(4).

[14] *Id.*, § 778 (c).  The directors are required to apportion an association's profits at least annually.

[15] *Id.*, § 773.

[16] *Id.*, § 768 (c).

[17] *Id.*, § 768 (b).

securities under the Securities Exchange Act.[18]  Even a casual reading of § 3 (a)(10) of the 1934 Act reveals that Congress did not intend to adopt a narrow or restrictive concept of security in defining that term.[19]  As this Court observed with respect to the definition of security in § 2 (1) of the Securities Act of 1933, "the reach of the Act does not stop with the obvious and commonplace." *S. E. C.* v. *C. M. Joiner Corp.,* 320 U. S. 344, 351 (1943).  As used in both the 1933 and 1934 Acts, security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *S. E. C.* v. *W. J. Howey Co., supra,* at 299. We have little difficulty fitting the withdrawable capital shares held by the petitioners into that expansive concept of security.  Of the several types of instruments designated as securities by § 3 (a)(10) of the 1934 Act, the petitioners' shares most closely resemble investment contracts.  "The test [for an investment contract] is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Id.,* at 301. Petitioners are participants in a common enterprise— a money-lending operation dependent for its success upon the skill and efforts of the management of City Savings in making sound loans.  Because Illinois law ties the payment of dividends on withdrawable capital shares to an apportionment of profits,[20] the petitioners

---

[18] Cf. *S. E. C.* v. *Variable Annuity Life Ins. Co.,* 359 U. S. 65, 69.

[19] "[T]he term 'security' [in the Securities Act of 1933 is defined] in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security."  H. R. Rep. No. 85, 73d Cong., 1st Sess., 11 (1933).

[20] Ill. Rev. Stat., c. 32, § 778.

can expect a return on their investment only if City Savings shows a profit. If City Savings fails to show a profit due to the lack of skill or honesty of its managers, the petitioners will receive no dividends. Similarly, the amount of dividends the petitioners can expect is tied directly to the amount of profits City Savings makes from year to year. Clearly, then, the petitioners' withdrawable capital shares have the essential attributes of investment contracts as that term is used in § 3 (a)(10) and as it was defined in *Howey*.[21] But we need not rest our decision on that conclusion alone. "Instruments may be included within any of [the Act's] definitions, as matter of law, if on their face they answer to the name or description." *S. E. C.* v. *C. M. Joiner Corp., supra,* at 351. The petitioners' shares fit well within several other descriptive terms contained in § 3 (a)(10). For example, the petitioners' shares can be viewed as "certificate[s] of interest or participation in any profit-sharing agreement." The shares must be evidenced by a certificate,[22] and Illinois law makes the payment of dividends contingent upon an apportionment of profits. These same factors make the shares "stock" under § 3 (a)(10). Finally, the petitioners' shares can be considered "transferable share[s]" since "[t]he holder of a withdrawable capital account

---

[21] The Court of Appeals refused to apply the *Howey* test in this case. It did not view the petitioners as entering a common enterprise with profits to come solely from the efforts of others because "profit is derived from loans to other members of the savings and loan association." 371 F. 2d, at 377. That analysis, however, places too much emphasis on the fact that, under Illinois law, anyone who borrows from a savings and loan association automatically becomes a member of the association. Ill. Rev. Stat., c. 32, § 741 (a)(2). It also overlooks the several other classes of investments which Illinois savings and loan associations are authorized to make. *Id.,* §§ 792–792.10.

[22] *Id.,* § 768 (a).

may transfer his rights therein absolutely or conditionally to any other person eligible to hold the same." [23]

Our conclusion that a withdrawable capital share is a security within the meaning of § 3 (a)(10) is reinforced by the legislative history of federal securities legislation. When Congress was considering the Securities Act of 1933, representatives of the United States Building and Loan League appeared before House and Senate committees to plead the cause of the League's members. The League's spokesmen asked Congress for an exemption from the Act's registration requirements for building and loan association shares. The spokesmen argued that the cost of complying with the registration requirements whenever a building and loan association issued a new share would be prohibitive. However, the League's spokesmen emphatically endorsed the coverage of building and loan associations under the Act's antifraud provisions.[24] Thus, Morton Bodfish, the League's Executive Manager, told the House Committee on Interstate and Foreign Commerce:

> "When a person saves his money in a building and loan association, he purchases shares and nearly all of our $8,000,000,000 of assets are in the form of shares . . . .
>
> "The practical difficulties of an association having to register every issue of shares . . . are obvious.[25]

·　　　　·　　　　·　　　　·　　　　·

---

[23] *Id.,* § 768 (b).

[24] Hearings on H. R. 4314 before the House Committee on Interstate and Foreign Commerce, 73d Cong., 1st Sess., 70–75 (1933) (testimony of Morton Bodfish, Executive Manager, United States Building and Loan League); Hearings on S. 875 before the Senate Committee on Banking and Currency, 73d Cong., 1st Sess., 50–54 (1933) (testimony of C. Clinton James, Chairman, Federal Legislative Committee of the United States Building and Loan League).

[25] Hearings on H. R. 4314, *supra,* at 71.

"[W]e approve vigorously and are quite willing to be subject to section 13, which is the fraud section . . . .[26]

. . . . .

"Now, gentlemen, we want you to leave the fraud sections there, just as they are, so that [if] any fraud developed in connection with the management of any of our institutions anywhere or under the name of building and loan, this law can be effective and operative." [27]

Congress responded to the appeals from the building and loan interests by including in § 3 (a)(5) of the 1933 Act an exemption from the registration requirements for "[a]ny security issued by a building and loan association, homestead association, savings and loan association, or similar institution . . . ." [28] It seems quite apparent that the building and loan interests would not have sought an exemption from the registration requirements and Congress would not have granted it unless there was general agreement that the Act's definition of security in § 2 (1) brought building and loan shares within the purview of the Act.[29]

---

[26] *Id.*, at 73.

[27] *Id.*, at 74.

[28] 15 U. S. C. § 77c (a)(5).

[29] The view expressed by the building and loan association interests in 1933 has not changed over the years. The United States Savings and Loan League, in its Membership Bulletin, made the following comments on the Court's decision to hear this case:

"This case is not necessarily as significant and earth shaking in its implications as many savings and loan people assume. In the first place the savings and loan business always has assumed that it was subject to the antifraud provisions of the Securities Acts relating to advertising practices, etc. Regardless of how this case goes it does not mean that savings and loan associations will be any more involved with the SEC than they have been in the past. It does not mean that associations would have to register with the

The same Congress which passed the Securities Act in 1933 approved the Securities Exchange Act in 1934, and the definition of security contained in the 1934 Act is virtually identical to that in the earlier enactment. The legislative history of the 1934 Act is silent with respect to savings and loan shares, but the Senate Report on the Act asserts that its definition of security was intended to be "substantially the same as [that contained] in the Securities Act of 1933." S. Rep. No. 792, 73d Cong., 2d Sess., 14 (1934). In addition, when Congress amended the 1934 Act in 1964 to provide for the registration of certain equity securities, it provided an exemption for "any security . . . issued by a savings and loan association . . . ." 15 U. S. C. § 78*l* (g)(2)(C). Thus, the 1934 Act has a pattern of coverage and exemption of savings and loan shares similar to the pattern in the 1933 Act.[30]

---

SEC and be subject to all of the rules that apply to typical securities transactions."

United States Savings and Loan League, Membership Bulletin, June 28, 1967, p. 15.

[30] The Court of Appeals rejected the view that we take of the legislative history of federal securities legislation with respect to savings and loan association shares. In effect, the Court of Appeals viewed Congress' exemption of savings and loan shares from the registration requirements as what Professor Loss calls "supererogation." 1 Loss, Securities Regulation 497 (2d ed. 1961). The Court of Appeals based its argument on the analogy it drew between ordinary insurance policies, which are also exempted from the 1933 Act's registration provisions, and savings and loan shares. The analogy, however, is inappropriate. Congress specifically stated that "insurance policies are not to be regarded as securities subject to the provisions of the act," H. R. Rep. No. 85, 73d Cong., 1st Sess., 15 (1933), and the exemption from registration for insurance policies was clearly supererogation. See *S. E. C.* v. *Variable Annuity Life Ins. Co.*, 359 U. S. 65, 74, n. 4. The same cannot be said for savings and loan shares, particularly when the spokesmen for those who issue savings and loan shares had told Congress they fully expected to be covered by the 1933 Act's antifraud provisions.

We view the Court of Appeals' conclusion that the petitioners' withdrawable capital shares are not securities as a product of misplaced emphasis. After reviewing the definition of security in § 3(a)(10), the Court of Appeals stated that "[t]he type of interest now before us, if it is covered by this definition, must be an 'instrument commonly known as a "security." ' " 371 F. 2d, at 376. Thus, the Court of Appeals read the words an "instrument commonly known as a 'security' " in § 3 (a)(10) as a limitation on the other descriptive terms used in the statutory definition. This, of course, is contrary to our decision in *Joiner* where we rejected the respondents' invitation to "constrict the more general terms substantially to the specific terms which they follow." 320 U. S., at 350. In addition, we cannot agree with the Court of Appeals' analysis which led it to conclude that a withdrawable capital share is not an "instrument commonly known as a 'security.' " For example, the Court of Appeals stressed that withdrawable capital shares can be issued in unlimited amounts and their holders have no pre-emptive rights. Yet the same is true of shares in mutual funds, and we have little doubt that such shares are securities within the meaning of the Securities Exchange Act. The Court of Appeals also emphasized that the withdrawable capital shares are made nonnegotiable by Illinois law. This simply reflects the fact that such shares are not a usual medium for trading in the markets. The same can be said for the types of interests which we found to be securities in *Howey* and *Joiner*.[31] The Court of Appeals noted further that the holders of withdrawable capital shares are not entitled under Illinois law to inspect the gen-

---

[31] In *Howey,* this Court ruled that interests in orange groves were securities under the 1933 Act. In *Joiner,* it held that oil leases were securities under the Act.

eral books and records of the association. Inspection of that nature, however, is not a right which universally attaches to corporate shares.[32] In short, the various factors highlighted by the Court of Appeals in concluding that the withdrawable capital shares are not an "instrument commonly known as a 'security' " serve only to distinguish among different types of securities. They do not, standing alone, govern whether a particular instrument is a security under the federal securities laws.

The Court of Appeals thought it highly significant that the term "evidence of indebtedness" appears in the definition of security in the 1933 Act but was omitted from the definition in the 1934 Act. We cannot agree that the omission has any controlling significance in this case. For one thing, we have found other descriptive terms in § 3 (a)(10) which cover the petitioners' withdrawable capital shares. The Court of Appeals' emphasis on the omission of "evidence of indebtedness" from § 3 (a)(10) flowed from its conclusion that the petitioners' "relationship with the enterprise is much more that of debtor-creditor than investment." 371 F. 2d, at 377. That assertion, however, overlooks the fact that, under Illinois law, the holder of a withdrawable capital share does not become a creditor of a savings and loan association even when he files an application for withdrawal.[33] For this reason alone, the omission of the term "evidence of indebtedness" from § 3 (a)(10) provides no basis for concluding that Congress intended to exclude the petitioners' withdrawable capital shares from the Act's coverage.

The Court of Appeals sought a policy basis for its decision when it noted that the federal securities laws

---

[32] See Baker & Cary, Cases and Materials on Corporations 739–741 (3d ed. 1958).

[33] Ill. Rev. Stat., c. 32, § 773 (f).

"were passed in the aftermath of the great economic disaster of 1929. Congress was concerned with speculation in securities which had a fluctuating value and which were traded in securities exchanges or in over-the-counter markets." 371 F. 2d, at 377. This statement suggests, and the respondents have argued in this Court, that the petitioners' withdrawable capital shares are not within the purview of the 1934 Act because their value normally does not fluctuate and because they are normally not traded in securities exchanges or over-the-counter. The accuracy of this assertion is open to question.[34] But, more important, it is irrelevant to the question before us. As was observed in *Howey*, "it is immaterial whether the enterprise is speculative or non-speculative." 328 U. S., at 301.

Policy considerations lead us to conclude that these petitioners are entitled to the investor protections afforded by the Securities Exchange Act. We agree fully with the following observations made by Judge Cummings in his dissent below:

> "The investors in City Savings were less able to protect themselves than the purchasers of orange groves in *Howey*. These [petitioners] had to rely completely on City Savings' management to choose suitable properties on which to make mortgage loans. . . . The members of City Savings were widely scattered. Many of them probably invested in City Savings on the ground that their money

---

[34] The SEC, in its brief *amicus curiae* submitted in this case, points out that it granted a temporary exemption from §§ 7, 8, 12, and 13 of the 1934 Act to passbooks of savings and loan associations, which were being traded on the Cleveland Stock Exchange shortly after the Act's passage. The SEC also points out that it has repeatedly enforced the Act's registration provisions against brokers and dealers whose business includes the solicitation of funds for deposit in savings and loan associations. Brief for the SEC 22–24.

would be safer than in stocks. . . . Because savings and loan associations are constantly seeking investors through advertising . . . the SEC's present tender of its expert services should be especially beneficial to would-be savings and loan investors as a shield against unscrupulous or unqualified promoters." 371 F. 2d, at 384–385.

The respondents have argued that we should not declare the petitioners' withdrawable capital shares securities under § 3 (a)(10) because the petitioners, if they are successful in their suit for rescission, will gain an unfair advantage over other investors in City Savings in the distribution of the limited assets of that Association, which is now in liquidation. This argument, at best, is a *non sequitur*. This case in its present posture involves no issue of priority of claims against City Savings. This case involves only the threshold question of whether a federal court has jurisdiction over the complaint filed by the petitioners—a question which turns on our construction of the term "security" as defined by § 3 (a)(10) of the Securities Exchange Act of 1934. It is totally irrelevant to that narrow question of statutory construction that these petitioners, if they are successful in their federal suit, might have rights in the limited assets of City Savings superior to those of other investors in that Association.

*Reversed.*

MR. JUSTICE MARSHALL took no part in the consideration and decision of this case.