493 F.2d 1027
 Fed. Sec. L. Rep. P 94,436
GLEN-ARDEN COMMODITIES, INC., and Milbank Trading Co., Inc.,
et al., Petitioners,
v.
Hon. Mark A. COSTANTINO, U.S.D.J., Respondent.
SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
GLEN-ARDEN COMMODITIES, INC., et al., Defendants.
SECURITIES AND EXCHANGE COMMISSION, Appellee,
v.
GLEN-ARDEN COMMODITIES, INC., and Milbank Trading Co., Inc.,
et al., Appellants.
 Nos. 817, 818, 1001, Dockets 74-1039, 74-1069, 74-1236.
 United States Court of Appeals, Second Circuit.
 Argued Jan. 23, 1974.
Decided March 14, 1974.
 
 Bradley R. Brewer, New York City (Brewer & Soeiro, New York City), for appellants.
 Michael A. Macchiaroli, Securities and Exchange Commission, Washington, D.C. (Walter P. North, Associate Gen. Counsel, Robert E. Kushner, Asst. Gen. Counsel, Washington, D.C., Steven J. Shore, New York City, Atty., New York Regional Office), for appellee.
 Before HAYS, MANSFIELD and OAKES, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 The case before us is a consolidation of two appeals and a petition for mandamus. One appeal and the petition relate to certain 'temporary restraining orders' entered by the United States District Court for the Eastern District of New York. The second appeal is from a preliminary injunction entered by the same court on January 18, 1974.
 
 
 2
 The orders and injunction below were entered at the behest of the Securities and Exchange Commission in its suit to enjoin Glen-Arden Commodities, Inc., and Milbank Trading Co., Inc., together with certain individual officers and directors of these two closely related companies (the Glen-Arden defendants), from certain acts, practices and courses of conduct allegedly in violation of the Securities Act of 1933 and the Securities Exchange Act of 1934. On the merits, the question presented is essentially whether the Glen-Arden defendants were selling commodities consisting of casks of Scotch whisky, not subject to SEC regulation, or whether they were selling securities within the ambit of 2(1) of the Securities Act, 15 U.S.C. 77b(1)[1] On August 23, 1973, the Commission sued the petitioners to enjoin them from conduct in violation of 5(a), 5(c) and 17(a) of the Securities Act of 1933, as amended, 15 U.S.C. 77e(a), 77e(c) and 77q(a), and 10(b), 15(a) and 15(b) of the Securities Exchange Act of 1934, 15 U.S.C. 78j(b), 78o(a) and 78o(b), and Rule 10b-5 thereunder, 17 C.F.R. 240.10b-5. At the same time the suit was begun, the Commission served the Glen-Arden defendants with a motion for a preliminary injunction returnable September 21, 1973. After a number of procedural fits and starts, which included an extension of the return date on the preliminary injunction motion, a denial of a Commission request for a temporary restraining order, various postponements of evidentiary hearings and the filing of motions for summary judgment, the Glen-Arden defendants filed a notice of motion seeking to prevent the commencement of an evidentiary hearing pending the convening of a three-judge court to consider whether the term 'investment contract' in the statutory definition of the term 'security' in the federal securities laws was void for vagueness. This motion was filed although this court had ruled in SEC v. Brigadoon Scotch Distributing Co., 480 F.2d 1047, 1052 (2d Cir.1973), cert. denied, 415 U.S. 915, 94 S.Ct. 1410, 39 L.Ed.2d 469 (1974), that the argument was 'untenable.' The district court on November 15, 1973, denied the motion to convene a three-judge panel and from this the defendants filed an application for a stay in the court of appeals. We heard the matter on November 16, 1973, treated the application as one for a writ of mandamus, and denied it from the bench (No. 73-2699). On that same day, the district court began its hearings on the SEC's motion for a preliminary injunction. At the close of the day's testimony the SEC again requested a temporary restraining order, and after oral argument the district court granted a temporary restraining order until the next hearing day, a week later.
 
 
 3
 On November 23, 1973, the hearing was continued and considerable testimony was heard from investor witnesses and approximately 40 documents were introduced into evidence, and again after the hearing the SEC requested and the court granted a temporary restraining order, this one 'pending determination of the plaintiff Commission's motion for injunctive relief.' The evidentiary hearing continued on November 30, 1973, and on December 5, 1973, the court granted another temporary restraining order pending determination of the SEC's motion for injunctive relief. On December 10, 11, 17 and 18, 1973, hearings continued, despite the trial judge's prediction that the case would be disposed of on November 23, and by that time almost 100 exhibits had been introduced and 800 pages of testimony taken. On December 18, after the final day of hearings, the court issued yet another self-styled 'Temporary Restraining Order' which was to continue pending determination of the Commission's motion for injunctive relief. This order, identical to those which preceded it, restrained defendants from, among other things, selling or offering for sale securities in the form of Scotch whisky warehouse receipts or any other securities of any other issuer in violation of the registration and anti-fraud provisions of the Securities Act and the Securities Exchange Act.
 
 
 4
 On January 10, 1974, the defendants filed this petition for mandamus regarding, and a notice of appeal from, the temporary restraining orders of November 23, December 5 and December 18, 1973 ('the order'). The defendants sought a stay by this court of the orders in effect and a prompt and expedited hearing of the issue presented by the petition and other relief. Thereafter, on January 17, 1974, the district court issued an opinion containing findings of fact and conclusions of law and on January 18, 1974, signed a preliminary injunction restraining defendants from violating the applicable sections of the Acts involved. On January 21, 1974, the Glen-Arden defendants filed a notice of appeal from that preliminary injunction. Thereafter, on oral argument, we granted the motion of the defendants, consented to by the SEC, to consolidate this latter appeal with the appeal and petition for mandamus then before us. We denied, however, a motion by the Glen-Arden defendants to file an additional brief in the latest appeal in light of the delay that this would cause and in light of the fact that the merits were fully briefed on both sides in the papers in the initial appeal.
 
 
 5
 The temporary restraining orders, attacked by the Glen-Arden defendants in the first appeal and the petition for mandamus, by their own terms were effective only 'pending determination of . . . the motion for injunctive relief.' This presumably referred to the motion for a preliminary injunction which was before the court. Thus, inasmuch as the court has now rendered its decision on the preliminary injunction, the temporary restraining orders, whether valid or not when entered, have now lapsed and any decision on them would be moot.[2]
 
 
 6
 Accordingly, then, we shall direct our attention to the appeal from the preliminary injunction of January 18, taking into account the findings of fact made by the district judge on the basis of the evidence presented. Essentially the facts may be stated as follows.
 
 
 7
 Milbank Trading Co., Inc. (Milbank), is a New York corporation and wholly owned subsidiary of First Credit Bank, Ltd., a Bahamian corporation. Glen-Arden Commodities, Inc. (Glen-Arden), which was known until early 1973 as Milbank Trading Co. of Connecticut, Inc., is a Connecticut corporation. Defendant Deeb is the president of Glen-Arden and was an officer of Milbank. Defendant Lamonica was a controlling person of Milbank and Milbank's Scotch buyer as well as a stockholder and president of Scotch Exchange, Ltd., a Bahamian corporation which supplies Milbank with Scotch whisky. Defendant Weinstein is president of the First Credit Bank, Ltd., and president of Milbank as well as a stockholder and director of Scotch Exchange, Ltd. Defendant Loffman and defendant Losey were sales representatives for Glen-Arden, as is defendant Loeb, who also owns 10 per cent of Glen-Arden's stock. Defendant Galioto is the vice president and secretary of Milbank.
 
 
 8
 Milbank began in February, 1967, to engage in the offer and sale of Scotch whisky warehouse receipts, which evidence ownership of casks of whisky stored in bonded warehouses in Great Britain. This was done apparently through a number of affiliated corporations including Glen-Arden and its predecessor. Milbank's sales are effectuated through these affiliates. Milbank and Glen-Arden are essentially one in that Milbank supplies Glen-Arden with all its whisky at an agreed price, processes all of Glen-Arden's paper work, refers customers to Glen-Arden and grants Glen-Arden exclusive sales rights in specified areas. Milbank performs a number of services for Glen-Arden customers including the payment of insurance and warehousing charges. The sales literature of the two companies is closely coordinated and in some cases virtually identical. In Dun & Bradstreet reports Glen-Arden refers to the fact that it is 'closely affiliated' with Milbank, and there is evidence that Glen-Arden solicitations explaining the advantages of investment in whisky refer to how Milbank of New York's customers have realized a profit.
 
 
 9
 As stated, Milbank obtains its inventory through the efforts of its buyer, defendant Lamonica, who purchases all of Milbank's Scotch from the Bahamian corporation, Scotch Exchange, Ltd. While not perhaps material to the main point at issue, it is obvious that purchases through the related corporations have enabled the defendants substantially to mark up their whisky investments through a series of resales and to allocate a large portion of any total corporate profits to the books of foreign corporations. These Bahamian corporations have also been used to make offers to repurchase whisky from investors, thereby lending credence to the predictions of profit made by the salesmen. The salesmen also have referred to their connections in the Bahamas in that they can sell the investors' whisky there in order to avoid federal taxes.
 
 
 10
 Glen-Arden conducts its representation through sales representatives whom it trains and pays on a commission basis; it also provides sales literature in the form of mailings and news or other releases.
 
 
 11
 There is no basic dispute for purposes hereof with the findings below that the defendants' mode of operation was to recruit salesmen familiar with neither the Scotch whisky business nor investment practices and to provide them with a canned sales pitch along with sales literature and direct them to potential customers solicited through mass merchandising techniques such as newspaper advertisements and the indiscriminate use of mailing lists. The specific defendants Deeb, Loffman, Loeb and Losey appeared at various sales meetings during which salesmen were instructed to make certain assertions to induce the customers to invest in Scotch whisky warehouse receipts. These included:
 
 
 12
 1. Milbank's expertise would be utilized in selecting the type and quality of Scotch whisky in casks to be purchased;
 
 
 13
 2. Customers could call Milbank and obtain current information about the Scotch whisky market;
 
 
 14
 3. Milbank would provide the cooperage of the whisky, that is to say, the storing of it in casks during its maturation period;
 
 
 15
 4. Milbank would provide two insurance policies to protect the investments;
 
 
 16
 5. When the customers wished to sell their whisky Milbank would assist them in making a sale without fee or commission;
 
 
 17
 6. Milbank would handle all administrative details; and
 
 
 18
 7. Customers could expect a doubling of the value of their investments in three to four years and further increments after that, primarily on the basis that Scotch whisky was a unique investment in that its value enhances merely with age and all of the supply is always sold, whereas in fact the evidence is that the value of Scotch is determined by the basic laws of supply and demand.
 
 
 19
 The documentation supplied to the Glen-Arden investors included an original sales order which set out the quantity of whisky purchased and the price paid for it; a confirmation evidencing the number of barrels of whisky purchased, the amount of whisky contained in each barrel, and the registration number for each barrel; a copy of the warehouse keeper's records; transfer certificates issued by the distillery confirming transfer and registration of ownership to the purchasing investor; two insurance policies insuring generally against error or fraud by the warehouse keeper; and a form ordering the warehouse keeper to transfer ownership, which form includes the warranty of the signature of the new owner. The evidence showed that investors never contemplated taking actual physical possession of the whisky, but rather they paid a single price, e.g.,.$2.80 per gallon, with the understanding that Glen-Arden and Milbank would do all that was necessary to turn a profit for its investors. There was evidence from customers that they relied upon the experties of defendawnts in the management of the investments and were not fully apprised of the risks involved in investments of Scotch, including fluctuations in price or difficulties in resale, particularly of the small quantities involved in terms of the investors' purchases. The providing of cooperage and insurance and promised assistance in the liquidation of their investments was of the greatest importance to the investors who, according to their testimony, without them would not have purchased the warehouse receipts. There was evidence indicating that defendants and their agents made promises to prospective investors that the whisky purchased would double in value in four, triple in six, and perhaps even quadruple in eight years, but in any event would enhance in value day by day; in this regard, investors were not told that there was a substantial surplus of the production of grain whiskey in the late 1960's which had severely depressed grain whiskey prices.[3] Moreover, the defendants did not indicate to their customers that they were charging Scotch whisky prices considerably in excess of the prices charged by other brokers; Glen-Arden's prices in early 1972 were.$2.80 per unit as opposed to prices available elsewhere of between $1 and $1.50. According to defendant Deeb's testimony, 1968 and 1969 investments in Scotch are now worth approximately $2 per unit. There was additional evidence from which it could be found that there were misrepresentations relative to the expertise of the defendants as to market conditions, prices and types and quality of Scotch investments. For example, defendants' expert advice included a recommendation of the purchase of grain whiskey rather than what they called the 'volatile malt.' Until recently, however, the defendants have never had experience in selling 'volatile malt,' and there is other evidence that investments in malts have produced better returns than investments in grains. Investors were not told that there is no organized Scotch whisky market and that the small investors' quantities are not interesting to most of the brokers.
 
 
 20
 The Glen-Arden defendants argue here that as a matter of law they were engaged in the sale of commodities or certificates of interest therein and, therefore, their activities are not within the regulatory authority of the SEC as found in the Securities Act of 1933 and the Securities Exchange Act of 1934. The point is argued that in 1934 the definition of the term 'security' in 2(1) of the Securities Act, 15 U.S.C. 77b, was specifically amended, among other ways, to excise the phrase 'certificate of interest in property, tangible or intangible,' which had originally been an example of a security. That phrase was removed in the 1934 amendments 'as possibly involving too broad and uncertain application.' H.R.Rep.No.1838, 73d Cong., 2d Sess. 39 (1934). The appellants argue that what they were selling were 'certificates of interest in (tangible) property' and that neither expressly nor inferentially can the statute, as amended, include either negotiable warehouse receipts or non-negotiable documents of title to specific identified casks of bonded Scotch whisky in storage such as were sold by the appellants.[4] In addition to its argument based on the legislative history, the appellants seek to have us find that its operation was equivalent to the selling of futures contracts, such as are made in commodities like wheat, soy beans, cocoa, sugar, tobacco, etc., which are not included in the coverage of the Securities Act. See McCurnin v. Kohlmeyer & Co., 340 F.Supp. 1338 (E.D.La.1972); Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 253 F.Supp. 359 (S.D.N.Y.1966). To quote from appellants' brief (p. 46), Congress 'definitely did not intend . . . to give the SEC statutory authority to regulate sales of any kind of fungible 'commodity' whether it be wheat, soy beans or Scotch whisby stored in barrels somewhere in Scotland and aging in bonded warehouses.'[5]
 
 
 21
 Initially we note that, as we ourselves have been repeatedly enjoined by the Supreme Court, the federal securities laws are to be construed 'not technically and restrictively, but flexibly to effectuate (their) remedial purposes.' SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195,84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963). See also Affiliated Ute Citizens v. United States, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). The mechanical and pedantic reading of the legislative history suggested to us by appellants would not be within that spirit of flexible construction. The mere fact that the words 'certificate of interest in property, tangible or intangible,' were excised from the definition of a security on the basis that they were open to too broad interpretation does not support the notion that all certificates of interest in property were to be excluded from the coverage of the Act. In short, what is determinative is not what is left out of the definition of a security, but rather what is included.
 
 
 22
 The question therefore becomes whether the customers were in fact purchasing simply warehouse receipts, akin to a commodity future, or whether, in light of the economic reality and the totality of circumstances surrounding the sales here, the customers were making an investment, which in view of the appellants' commitments and representations constituted an 'investment contract' within the meaning of 2(1) of the Securities Act, 15 U.S.C. 77b(1). The Supreme Court has stated that the test whether a contract constitutes an investment contract within the Securities Act[6] is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.' SEC v. C. M. Jiner Leasing Corp., 320 U.S. 344, 352-353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943) (quoted approvingly in SEC v. United Benefit Life Insurance Co., 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967)).
 
 
 23
 In Joiner the Court found that, while the definition of 'security' in the Securities Act specifically included only fractional undivided interests in oil and gas rights and not specific parcels, the sale of specific parcels there was indeed a security or investment contract under 2(1) of the Act, 15 U.S.C. 77b(1). In doing so, the Court through Mr. Justice Jackson went to proof 'outside the instrument itself,' 320 U.S. at 355, 64 S.Ct. at 120 to establish the conclusion that the defendants were not offering naked leasehold rights but rather were selling documents which offered the purchaser a chance of sharing in discovery values which might follow a current exploration enterprise. As the Court said, 'Had the offer mailed by defendants omitted the economic inducements of the proposed and promised exploration well it would have been a quite different proposition.' 320 U.S. at 348, 64 S.Ct. at 122. It was 'an economic interest in this well-drilling undertaking (that) . . . brought into being the instruments that defendants were selling and gave to the instruments most of their value and all of their lure.' 320 U.S. at 349, 64 S.Ct. at 122. As the Court held, at 351, 64 S.Ct. at 123,
 
 
 24
 the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices whatever they appear to be, are also reached if it be proved as (a) matter of fact that they were widely offered or dealt in under terms or courses of dealing which establish their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a security.'
 
 
 25
 Judged by the Joiner test there can be no question but that here the appellants were selling investment contracts. The defendants guaranteed services, they promised results. The economic inducements were in the nature of inducements to invest. The evidence below shows that investors put up their money not so much to secure casks of Scotch whisky but to participate in an enterprise which was virtually guaranteed to 'double their money' in four years. It ill behooves appellants, after enticing their customers with fancy brochures touting their investment plan, now to claim there was no investment plan but the mere sale of an unadorned commodity. Even worse, it does violence to the facts.
 
 
 26
 Here the customer, unlike the commodity buyer, while purchasing actual tangible property, was upon the representations of appellants buying in addition services absolutely necessary to the turning of the promised profit. In short, it was a 'package deal.' An investor was dependent upon appellants for the utilization of their 'expertise in selecting the type and quality of Scotch whisky and casks to be purchased . . .,' as found by the lower court. It is not as if they were buying simply X carolads of wheat or barley, a commitment to sell which could be supplied by the furnishing of any other carload of wheat or barley. Rather, the very investment made was in goods to be specifically selected by appellants. Appellants also represented that they would handle all the necessary arrangements for warehousing the Scotch and insuring it. Finally, and probably most important to the customers, appellants represented that they would find buyers for the Scotch or buy it back themselves. This service, especially in light of the absence of a market for small quantities of Scotch, another distinguishing feature from the commodity analogy, was crucial to any customer's hope to liquidate his investment.
 
 
 27
 This brings this scheme within the facts of a long line of cases where purported sales of tangible property, service contracts, or both were held to be investment contracts. See, e.g., SEC v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946); Continental Marketing Corp. v. SEC, 387 F.2d 466 (10th Cir.1967), cert denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L.Ed.2d 419 (1968); Blackwell v. Bentsen, 203 F.2d 690 (5th Cir.1953), cert. dismissed, 347 U.S. 925, 74 S.Ct. 528, 98 L.Ed. 1078 (1954); SEC v. Lake Havasu Estates, 340 F.Supp. 1318 (D.Minn.1972); SEC v. Payne, 35 F.Supp. 873 (S.D.N.Y.1940). See also SEC v. Glenn v. Turner Enterprises, Inc., 474 F.2d 476, 481-482 (9th Cir.1973). There have been many other schemes, in short, where the public was led into buying what purported to be tangible items when in fact what was being sold was an investment entrusting the promoters with both the work and the expertise to make the tangible investment pay off.[7] This long-term construction placed upon an act of Congress is hardly one that we could disturb even if we wanted to, at this late date.
 
 
 28
 There is ample evidence in the record to justify the trial court's decision that the SEC had clearly met its burden of showing probable success on the merits and that there was a likelihood of continued violations of the registration and anti-fraud provisions of the securities laws, thereby giving more than sufficient basis for entry of the order of preliminary injunction.[8] Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co., Inc., 476 F.2d 687, 692-693 (2d Cir.1973); Robert W. Stark, Inc. v. New York Stock Exchange, Inc., 466 F.2d 743, 744 (2d Cir. 1972); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2d Cir.1972).
 
 
 29
 Order of preliminary injunction affirmed; petition for writ of mandamus denied; appeal from temporary restraining orders dismissed.
 
 
 
 [1]
 77b. Definitions
 When used in this subchapter, unless the context otherwise requires--
 (1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.
 
 
 [2]
 We note that while temporary restraining orders are normally not appealable, we would not be bound by the trial court's characterization or even its conception of the orders. Belknap v. Leary, 427 F.2d 496, 498 (2d Cir. 1970); Grant v. United States, 282 F.2d 165, 167-168 (2d Cir. 1960). The distinguishing characteristics of a temporary restraining order under Fed.R.Civ.P. 65(b) are 'its availability as an ex parte remedy, and its propensity to self-destruct after twenty days, at the outside.' Morning Telegraph v. Powers, 450 F.2d 97, 99 (2d Cir. 1971). These characteristics are not present here where both sides had ample opportunity to be heard and indeed were heard, and where the orders were extended well beyond 20 days without explanation therefor. See 7 Moore, Federal Practice P65.07, at 65-82. Rather the orders seem more characteristic of preliminary injunctions, which have no specific time limitation and which can be entered only after both sides have been heard
 We are not advised, nor do we know, why, in view of the fact that the court was hearing so much testimony and taking so many exhibits, it did not follow the often salutary and time-saving practice of consolidating the application for a preliminary injunction with the hearing on the merits relative to the final injunction, as permitted by Fed.R.Civ.P. 65(a)(2).
 
 
 [3]
 Grain whiskey, also known as patent-still, is opposed to pot-still or malt whiskey; the grain whiskey is distilled from a fermented mash of barley malt and other, unmalted cereal grains. While some grain whiskey is sold as single or straight, generally speaking various grain whiskeys are blended with a number of other malt whiskeys for purposes of resale. See generally, 23 Encyclopedia Britanica 477 et seq. (1972 ed.)
 
 
 [4]
 The 1934 amendments to the Securities Act, as the House Report said, were 'intended to apply the Act to interests commonly known as 'securities' whether or not such interests are represented by any document or not.'
 
 
 [5]
 It may not be enough of an answer to appellants to say, as a connoisseur of Scotch might be tempted to say, that Scotch whisky is hardly fungible. We need not simply take judicial notice of the fact that the various Scotch whiskys vary with the type and character of the grain used for mash, with the form of distilling process, whether by pot-still or patent-still methods, with the quality and character of the water used or indeed with the character of fuel used in the kiln drying process, the smoke of which gives Scotch its special flavor. Nor need the appellants' arguments be answered simply by saying that, far from being fungible, Scotch whisky differs markedly, by brand and distillery, by blend, by year of blend and by age. See generally 23 Encyclopedia Britanica 477 et seq. (1972 ed.). We can suggest, however, that merely by referring to Scotch as fungible appellants seem to belie their own expertise
 
 
 [6]
 For our purposes the definition of 'security' in the Securities Exchange Act is 'virtually identical.' Tcherepnin v. Knight, 389 U.S. 332, 335-336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967)
 
 
 [7]
 The Scotch whisky investment game itself is not unknown to the SEC, and courts have uniformly found investment contracts there involved. In Penfield Co. of California v. SEC, 143 F.2d 746 (9th Cir.), cert. denied, 323 U.S. 768, 65 S.Ct. 121, 89 L.Ed. 614 (1944), the promoters agreed to bottle whiskey represented by warehouse receipts, to sell the bottled whiskey and to pay the contract holders the proceeds less a commission. As the court said, 143 F.2d at 750, the term 'investment contract' includes 'agreements where 'the purchasers (look) entirely to the efforts of the promoters to make their investment a profitable one," quoting Atherton v. United States, 128 F.2d 463, 465 (9th Cir. 1942). This analysis was approved in SEC v. W. J. Howey Co., 328 U.S. 293, 298-299, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). In Penfield the appellant pointed to its expertise in knowing when whiskey might age and be bottled and pointed to the expectations of profit in terms of the whiskey receipt holder receiving double the amount he would by a sale of the bulk whiskey; there, too, the contract holders did not have the facilities to take the whiskey and dispose of it
 Even more recent cases involving whiskey where courts found investment contracts include SEC v. Haffenden-Rimar International, Inc., 362 F.Supp. 323 (E.D.Va.1973), appeal pending, where the investors relied solely upon the advice of the defendants in selecting, buying, storing, trading and selling the Scotch represented by their warehouse receipts, and SEC v. M. A. Lundy Associates, 362 F.Supp. 226, 236 et seq. (D.R.I.1973), where the defendants sold warehouse receipts for casks of malt whiskey under a plan virtually identical to that here.
 
 
 [8]
 Appellants' argument that the district court should not have heard any evidence of fraud is also absurd because in determining whether or not to grant preliminary relief the district court was bound to consider whether or not there was a likelihood of success on the merits. Moreover, many of the facts necessary to demonstrate that the contracts were securities involved the inducements and representations made to engender sales, facts closely related to any claim of fraud