**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**BRIGADOON SCOTCH DISTRIBUTORS, LTD., also d/b/a Highland-Dunes Scotch Investors, Ltd., et al., Defendants.**

**No. 74 Civ. 5422.**

United States District Court, S. D. New York.

Jan. 11, 1975.

---

William D. Moran, Regional Administrator, S.E.C., New York City, for plaintiff; William Nortman, Jeffrey Tucker, Steven J. Shore, Barry J. Mandel, New York City, of counsel.

Katz & Lipton, Great Neck, N. Y., for defendants FCR, Mark Rauch and Lawrence Corsa; Harry Katz, Great Neck, N.Y., of counsel.

LASKER, District Judge.

The present motion for a preliminary injunction raises the issue of whether the selling of rare coin portfolios by Federal Coin Reserve, Inc. falls within the terms of Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1).

The Securities and Exchange Commission (SEC) filed a complaint against the Federal Coin Reserve, Inc. (FCR), its principals, Mark Rauch and Larry Corsa, and other defendants, seeking temporary and permanent injunctive relief from alleged violations by defendants of the registration and anti-fraud provisions of the Securities Act of 1933, 15 U.S.C. §§ 77e(a), 77e, and 77q(a), and the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b). The SEC seeks the ap-

**1290**

pointment of a receiver for FCR and the disgorgement by FCR and its principals of proceeds received from the sale of rare coin portfolios. A limited temporary restraining order was issued and an evidentiary hearing on the motion for a preliminary injunction has been held.

## I.

FCR is in the business of selling rare coin portfolios. It stimulates sales by advertising in such media as airline magazines, journals used in the medical profession and other similar outlets. It does not advertise in publications specifically addressed to amateur or professional coin collectors. In general its customers are those who have responded to its advertisements. Upon a showing of interest by a customer, FCR mails to him an elaborate advertising brochure (Plaintiff's Exhibit 4) which contains a detailed description of the procedures involved in choosing the coins and of the services rendered by FCR to its customers. It is undisputed that FCR has filed no registration statement with the SEC. FCR opposes the issuance of the preliminary injunction and the other requested relief on the ground that its business, the selling of rare coin portfolios, does not constitute an investment contract within the meaning of Section 2(1) of the Securities Act, 15 U.S.C. § 77b(1).[1]

## II.

■■ At the outset we note that the burden the SEC must meet here is less stringent than that required for the issuance of a preliminary injunction in other civil contexts. The SEC need not make a showing of irreparable injury, SEC v. General Securities Co., 216 F. Supp. 350, 352 (S.D.N.Y.1962); 15 U.S. C. 78u(e), but must demonstrate only a

probability of success on the merits, Glen-Arden Commodities, Inc. v. Costantino, 493 F.2d 1027, 1035–1036 (2d Cir. 1974), or "a strong *prima facie* case." SEC v. Boren, 283 F.2d 312 (2d Cir. 1960); SEC v. Broadwall Securities, Inc., 240 F.Supp. 962, 967 (S.D.N.Y. 1965). Moreover the 1933 and 1934 securities acts "must be construed not technically and restrictively, but flexibly to effectuate [their] remedial purposes." SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195, 84 S.Ct. 275, 285, 11 L.Ed.2d 237 (1963); *accord,* Affiliated Ute Citizens v. United States, 406 U. S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). As Justice Jackson stated in SEC v. C. M. Joiner Leasing Corp., 320 U.S. at 351, 64 S.Ct. at 123:

> "[T]he reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached . . ."

■■ FCR contends that its selling of rare coin portfolios constitutes the offer and sale of commodities, not securities. It maintains that the various services offered by it in its advertising brochure are optional, rarely taken advantage of, and peripheral to its business. According to FCR, it actually *sold* coins, and only coins. Regardless of the nature of the ultimate sales here, FCR's analysis is not in keeping with the law because an investment contract is determinable not only by the nature of what the sellers actually sell but equally by

> "what character the instrument is given . . . by the terms of *offer,* the plan of distribution, and the economic inducements held out to the prospect. In the enforcement of an

---

1. Section 2(1) provides in part:
"The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, or, in general, any interest or instrument commonly known as a 'security'. Section 3(a)(10) of the Securities and Exchange Act defines a security in substantially the same language.

act such as this it is not inappropriate that promoters' offerings be judged as being what they were represented to be." SEC v. C. M. Joiner Leasing Corp., 320 U.S. 344, 352–353, 64 S.Ct. 120, 124, 88 L.Ed. 88 (1943). (Emphasis added)

The Court has defined an investment contract more specifically as

"a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." SEC v. W. J. Howey & Co., 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946).

The character of FCR's activities is determinable by the application of the *Howey* definition.

## A. Investment of Money

The defendants do not appear to dispute the Commission's claim that FCR customers purchase their coins as an investment for the purpose of making a profit. In any event, the record establishes and we find that FCR customers in fact do purchase their coins for the purpose and in the expectation of making a profit from later resales. The FCR customers who testified stated that they were not interested in pursuing the hobby of coin collecting. FCR produced no evidence to demonstrate that the motivation of those witnesses was atypical of its customers.

Moreover, it is significant that FCR's advertising brochure (Plaintiff's Exhibit 4, sent to all customers before orders are taken, or sales made) consistently described the collection of rare coins as an "investment". Comparisons of gains in the stock market with returns from coins, analysis of coin appreciation and similar investment information run in a constant and main stream throughout FCR's sales pitch. The placement of advertisements in airline magazines and medical journals rather than in ⅃umismatic periodicals bolsters the view that the thrust of FCR's efforts are directed at an investing, rather than a coin-collecting, public.

## B. Common Enterprise

Defendants' customers typically telephone an order to an FCR salesperson or fill out an order form for the purchase of rare coins. FCR confirms the order in writing, guaranteeing the coins as to authenticity and grade. Upon receipt of the purchase price, FCR forward the coins to the customer in coin envelopes which contain a description of the coin, its quality and grade. After delivery, customers normally exercise the option to take possession of their coins, and thereafter are free either to sell them to or with the help of FCR, or to any other individual. Once the customer receives the coins, he has no further obligation to deal with FCR.

FCR asserts that on this state of facts its customers are not engaged in a "common enterprise" either with other FCR customers or with FCR itself. The difficulty with FCR's position is that it is based on the assumption that a "common enterprise" is necessarily the equivalent of the purchase of a "share" in a common fund. This is a misreading of the cases. For example, in *Howey* itself the investors each purchased his own units in the citrus grove development in question, not undivided shares in the orchard. In *Joiner* the customers did not purchase undivided interests in land but rather leases to specific sections of the property. While it remains true that the most frequent type of common enterprise involves the purchase of shares in a fund, nevertheless the cases establish that the requisite commonality of enterprise may also be achieved when "the fortunes of all investors are inextricably tied to the efficacy [of the promoter's efforts]." SEC v. Koscot Interplanetary, Inc., 497 F.2d 473, 479 (5th Cir. 1974). The crucial inquiry is

"whether the efforts by those other than the investor are the undeniably *significant* ones, those essential managerial efforts which affect the failure or success of the enterprise." SEC v.

Glenn Turner Enterprises, Inc., 474 F.2d 476, 482 (9th Cir.), cert. denied, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973). (Emphasis added)

*Accord,* Glen-Arden Commodities, Inc. v. Costantino, *supra,* 493 F.2d at 1035. As Judge Oakes noted in *Glen-Arden,* a long line of cases has held purported sales of tangible property, service contracts, or both to be investment contracts. *See, e. g.,* Continental Marketing Corp. v. SEC, 387 F.2d 466 (10th Cir. 1967), cert. denied, 391 U.S. 905, 88 S.Ct. 1655, 20 L. Ed.2d 419 (1968); Blackwell v. Bentsen, 203 F.2d 690 (5th Cir. 1953), cert. dismissed, 347 U.S. 925, 74 S.Ct. 528, 98 L. Ed. 1078 (1954); SEC v. Payne, 35 F. Supp. 873 (S.D.N.Y.1940). The determining factors in those schemes was that

> "what was being sold was an investment *entrusting the promoters with both the work and the expertise to make the tangible investment pay off.*" (Emphasis in original) Glen-Arden Commodities, Inc. v. Costantino, *supra.*

Here the promoters are emphatically entrusted with the work and expertise of producing a pay off. For example, FCR customarily, indeed almost in every case, "selects the coins for investment purposes" (Plaintiff's Exhibit 4, p. 32).

Moreover, FCR's brochure (Plaintiff's Exhibit 4) is replete with promises of services extending beyond the initial purchase of rare coin portfolios. FCR offers assistance in selling the coins (Plaintiff's Exhibit 4, p. 32), accounting services (pp. 15, 18), insurance (p. 17), tax advice (p. 17), a depositary for the portfolios (p. 17), and estate planning (p. 18). While it is true that few of these services are actually demanded by purchasers, the representations made in the advertisement pamphlet present a package of expert skills deliverable to any FCR customer and offered to maxi-

mize the capital of FCR investors. The continuing nature of the relationship between FCR and its investors is further evidenced by FCR's promise of semi-annual accounting statements (p. 18), regular financial reports (p. 15), and daily bids by FCR experts in the coin market (p. 16).

Not surprisingly, the defendants now claim that none of these services affect the value or sales price of the coins. Although we do not consider that proposition relevant, FCR's brochure itself repeatedly entices its readers with assertions such as that it "has people working all day long, each and every day making certain that all potential avenues of profit are fully explored." (Plaintiff's Exhibit 4, p. 15). In *Howey* and *Joiner* the Supreme Court considered such investment-oriented advertising to be factors leading to the finding of an investment contract. SEC v. Howey & Co., *supra,* 328 at 295, 66 S.Ct. 1100; SEC v. Joiner, *supra,* 320 U.S. at 346, 64 S.Ct. 120. As Judge Oakes aptly stated in *Glen-Arden*:

> "It ill behooves appellants, after enticing their customers with fancy brochures touting their investment plan, now to claim there was no investment plan but the mere sale of an unadorned commodity." 493 F.2d at 1034–1035.

*See, also,* SEC v. Joiner, *supra,* 320 U.S. at 352–353, 64 S.Ct. 120.[2]

**C.** *Efforts of Others*

The final factor in the *Howey* definition is that the profits derive "solely from the efforts of the promoter or a third party", *supra,* 328 U.S. at 299, 66 S.Ct. at 1103. "Solely" is not to be read literally. In keeping with the general proposition that the securities laws be construed flexibly "to carry out in particular cases the generally expressed leg-

2. The SEC ruling of no action in regard to gold offerings, upon which defendant relies, is inapplicable to the facts here, since the promoter there "does not contemplate providing potential gold purchasers with invest-

ment advice or consultation with regard to the advisability of investing in gold . . . or any other matters regarding the purchase or sale of gold." CCH Fed.Sec.L.Rep. ¶ 80,037 at 84,813.

islative policy," SEC v. Joiner, *supra*, 320 U.S. at 350–351, 64 S.Ct. at 123:

"[T]he word 'solely' should not be read as a strict or literal limitation on the definition of an investment contract, but rather must be construed realistically, so as to include within the definition those schemes which involve in substance, if not form, securities." SEC v. Glenn W. Turner Enterprises, Inc., *supra*, 474 F.2d at 482.

While FCR does not require that its customers allow FCR "experts" to select the coins comprising the portfolios, its brochure (Plaintiff's Exhibit 4) states (p. 32), "Buy Orders are generally issued by the investor or member in cash terms . . ." and testimony at the hearing revealed that, for example, 38 out of 40 coin portfolios sold by one salesperson were, in fact, selected by FCR. These portfolios amount to approximately half of FCR's sales. This fact alone persuades us that the third aspect of the Howey test, that is, the dependence of the investor on the expertise of the seller to produce the expected profit, is present here. Coins do not appreciate in value at the same rate and accordingly their selection is the most crucial factor in determining how much profit an investor in coins will make. The fact that selection by FCR's experts was at the option of the buyer, is irrelevant because it is the *offer*, not the acceptance of the offer, that controls. SEC v. Howey, *supra*, 328 U.S. at 295, 66 S.Ct. 1100. And the presence of the package of investment advice and information referred to above of course only supports our finding.

The determination that FCR has offered and sold investment contracts is consistent with the steady judicial widening of the meaning of Section 2(1) and of the reach of the securities laws in general. *See, e. g.,* Glen-Arden Commodities, Inc. v. Costantino, *supra;* SEC v. Koscot, *supra;* SEC v. Glenn Turner, *supra;* Miller v. Central Chinchilla Group, Inc., 494 F.2d 414 (8th Cir. 1974); Forman v. Community Services, Inc., 500 F.2d 1246 (2d Cir. 1974), cert. granted, 419 U.S. 1120, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975).

Furthermore, the strong similarities between the structure of the business of FCR and that in *Glen-Arden* compel a finding that the SEC has demonstrated that it will probably succeed on the merits in this case. Glen-Arden offered expertise in selecting the type and quality of scotch whiskey to be purchased; FCR offers identical expertise in regard to rare coin portfolios. In both cases, customers were offered the right to secure current information about their particular investment markets from the sellers. Both businesses offered storage, insurance, assistance in resale without fee or commission, and the handling of administrative details. It is true that most FCR customers have chosen to take custody of the coins they purchase while the buyers of scotch whiskey in Glen-Arden never saw the property in which they invested. But there is no basis for holding that possession per se reconverts an investment contract to the sale of a commodity.

We conclude that FCR has sold investment contracts as alleged in the complaint. Since it is undisputed that the securities thus sold have not been registered, the Commission is entitled to preliminary injunctive relief. In the circumstances, we need not and, therefore, do not make any findings as to the SEC's additional allegations of fraud.

■ The application for the appointment of a Receiver is denied. No showing has been made that such a drastic remedy is necessary for the protection of the public. Indeed, it appears that the expense which a receivership would involve would not only impose an undue burden on the defendants but could jeopardize the interests of the public as well.

The motion for preliminary injunction is granted except insofar as the application is based on allegations of fraud and except that the application for the appointment of a Receiver is denied.

Submit order on notice.