(No. 44742.—)

JOHN J. LANIGAN, Commissioner of Savings and Loan Associations, v. APOLLO SAVINGS.—(FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION *et al.,* Appellants, v. TRANSCONTINENTAL INSURANCE AGENCY, Inc., *et al.,* Appellees.)

*Opinion filed October 2, 1972.*

WILLIAM J. SCOTT, Attorney General, of Chicago (FRANCIS T. CROWE, Assistant Attorney General, of counsel), for the Commissioner of Savings and Loan Associations.

ARTHUR W. LEIBOLD, JR., of Washington, D.C. and THOMAS R. MULROY and HOPKINS, SUTTER, OWEN,

MULROY & DAVIS, of Chicago, for appellant Federal Savings and Loan Insurance Corp.

EDWARD SLOVICK, JAMES S. GORDON, and JAMES V. CREEN, all of Chicago (FEIWELL, GALPER & GORDON and EPTON, McCARTHY, BOHLING & DRUTH Ltd., of counsel), for Intervenor-appellant Heritage Finance Co.

JACOB H. MARTIN, SYDNEY G. CRAIG, JOHN I. HENTZEL, and MARTIN, CRAIG, CHESTER & SONNENSCHEIN, of Chicago, for appellees.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

This appeal is taken from a judgment of the circuit court of Cook County finding, *inter alia,* that claimant, Federal Savings and Loan Insurance Corporation (hereinafter FSLIC), was not entitled to interest as assignee of insured withdrawable capital account holders of defendant, Apollo Savings—a state-chartered association (hereinafter Apollo). This finding was predicated upon the court's conclusion that the status of the holders of withdrawable capital accounts under the Illinois Savings and Loan Act (hereinafter I.S.L.A.) (Ill.Rev.Stat. 1969, ch. 32, par. 701 *et seq.*) was that of shareholders and not creditors of Apollo, thus negating any claim for interest from the date of default to the date of final distribution of Apollo's assets. We granted appeal. 50 Ill. 2d R. 302(b).

The stipulated facts may be summarized as follows. On April 8, 1968, FSLIC issued a cease and desist order prohibiting Apollo from paying a scheduled dividend because of the latter's seriously impaired financial condition. On April 26, 1968, plaintiff, Justin Hulman (then Commissioner of Savings and Loan Associations of the State of Illinois), issued an order taking custody of Apollo pursuant to section 7—8 of the I.S.L.A. (Ill.Rev.Stat. 1969, ch. 32, par. 848) and he appointed a receiver for the

purpose of liquidating Apollo. The order stated that custody was taken because "the association was unable to continue operations," and that "an emergency existed which might have resulted in loss to the members or creditors of the association." On the same day Apollo's directors adopted resolutions consenting to the Commissioner's order. Thereafter, on May 2, 1968, the Commissioner instituted these proceedings and the circuit court of Cook County entered an uncontested decree of liquidation finding that "sufficient cause existed on April 26, 1968, and still exists for the custody, liquidation and dissolution" of Apollo.

Apollo was an insured institution within the meaning of the National Housing Act. (12 U.S.C. secs. 1724(a) and 1726.) The appointment of a receiver constituted a "default" (12 U.S.C. sec. 1724(d)) and FSLIC was thereby required to pay insurance to Apollo's account holders. (12 U.S.C. sec. 1728(b).) As of March 31, 1971, the total insurance paid by FSLIC on nearly twenty thousand Apollo accounts was $54,289,660.

In return for the payment of insurance, each account holder delivered to FSLIC an assignment providing in part, as follows:

> "In consideration of the payment of insurance on said insured account, claimant hereby *** (b) assigns, transfers and sets over to the Corporation [FSLIC] all of claimant's right, title and interest in and to said insured account ***. It is understood that this assignment does not convey the assignor's interest in uninsured funds."

Pursuant to these assignments and the applicable provisions of the National Housing Act (12 U.S.C. secs. 1728(b), and 1729(b), (c)(1)) FSLIC became subrogated to the rights of the insured account holders in the assets of Apollo. *Marshall Savings and Loan Ass'n v. Henson, 78 Ill.App.2d 14.*

As of the default date, 589 depositors had accounts exceeding the then applicable insurance limit of $15,000. These account holders (uninsured depositors) had principal

claims against Apollo in excess of $1,000,000. Heritage Finance Company (hereinafter Heritage) was granted leave to intervene in the circuit court proceedings on behalf of itself and all other uninsured depositors. Heritage sought interest upon uninsured funds which Apollo owed to it from the date of the entry of the liquidation decree. While the judgment of the circuit court only denied FSLIC's claim, implicit in the judgment was a denial of any interest claim to uninsured depositors. On appeal we allowed Heritage's motion to intervene as an additional appellant.

The objectors to payment of post-default interest were owners of approximately 85% of the permanent reserve shares of Apollo. Their petition to intervene in the circuit court, which was allowed, alleged that they will be entitled to receive distribution of all assets of Apollo after payment in full is made for receivership expenses, claims by creditors of the association and claims by the withdrawable account holders of Apollo.

Edward P. Kelly, Chairman of the Board and chief executive officer of Apollo at the time of its closing, controlled approximately 80% of the outstanding permanent reserve shares. His control was exercised through Transcontinental Insurance Agency, Inc., the record owner of the Kelly stock. All of Transcontinental's stock was owned by his wife and her grandmother and he is its chief executive officer.

During oral argument of this cause we were informed that a majority of the permanent reserve shares owned by Transcontinental were pledged to secure a note, and had been recently sold to GWJ Investments, Inc. and George W. Jensen. They were granted leave to intervene as additional objectors. The remaining objectors are Eugene S. Ferrier, Amelia S. Ferrier and Helen Berdelle. The latter were directors of Apollo.

It is asserted by FSLIC and objectors that a potential liquidated surplus estimated between ten and twenty-five million dollars will occur as a result of Apollo's dissolu-

tion. FSLIC contends that this surplus will be created because of Apollo's closing, for its major cost of doing business—the payment of "dividends" to account holders —has terminated, thereby eliminating an annual cost of approximately $2,500,000. Apollo's income from mortgage investments, however, continues without interruption. Therefore, the receivership is operating at a profit and generating a surplus because it enjoys the income earned from nearly $56,000,000 deposited by account holders (and invested by Apollo in mortgages) without paying any return for the use of that money. We are therefore presented with the unique situation of the relative rights of the parties herein to the distribution of this substantial surplus.

It is the position of FSLIC, Heritage and the Commissioner that the trial court erred in construing that the holders of withdrawable capital accounts or their assignee (FSLIC) have the status of shareholders in Apollo and never become its creditors and are not entitled to interest as provided by law. Ill.Rev.Stat. 1969, ch. 74, par. 2.

FSLIC primarily argues that holders of withdrawable capital accounts enjoy a hybrid status as shareholders in the association and become its creditors upon default. Heritage urges that general equitable considerations permit the payment of post-default interest before any distribution to the permanent reserve shareholders. The Commissioner, supporting the aforementioned positions, contends that public policy dictates that once the holders of withdrawable capital accounts are denied the right to withdraw their funds or to receive dividends thereon because of liquidation proceedings, they become creditors entitled to interest.

The objectors primarily maintain that withdrawable capital account holders in a savings and loan association are mere shareholders under the pertinent provisions of the I.S.L.A. and cannot be treated as creditors, as bank depositors would be under similar circumstances. They

further argue that the receivership in the instant case is of an executive or administrative nature (*People ex rel. Knight v. O'Brien, 40 Ill.2d 354*) and controlled exclusively by the provisions of the I.S.L.A., which does not grant the court discretionary power to award interest. They conclude that general equitable principles are therefore inapplicable.

The salient question is the relation between withdrawable capital accounts and permanent reserve shares under the I.S.L.A. upon default of the association.

Section 4—1(a) of the I.S.L.A. (Ill.Rev.Stat. 1969, ch. 32, par. 761) provides that "The capital of an association may be represented by withdrawable capital accounts (shares and share accounts) or permanent reserve shares or both ***." Section 4—2 (par. 762) sets forth the characteristics of withdrawable capital accounts providing that they shall be (a) "Withdrawable ***; (b) Entitled to dividends as provided in this article; (c) Nonassessable for either debts or losses of the association." Section 3—2 (par. 742(d)(2)) establishes that the holder of a withdrawable capital account will have "the vote of one share for each one hundred dollars of the aggregate withdrawal value of such accounts." Section 4—8 (par. 768(c)) provides that a withdrawable capital account is nonnegotiable and not subject to article 8 of the Uniform Commercial Code pertaining to investment securities. Ill.Rev.Stat. 1969, ch. 26, par. 8—101 *et seq.*

Section 4—3 (par. 763) describes, in part, the nature of permanent reserve shares. It provides that they "shall constitute a secondary reserve out of which losses shall be paid after all other available reserves have been exhausted, and shall have a par value of one dollar [as here] ***." These shares are nonwithdrawable until all association liabilities, including the payment of withdrawable accounts, have been fully satisfied. Dividends upon these shares are subordinated to dividends payable upon withdrawable capital. (Ill.Rev.Stat. 1969, ch. 32, par.

780(b)(4).) Further examination reveals that section 3—2 (par. 742(d)(3)) allows the permanent reserve shareholders one vote for each share, and these shares are subject to those sections of article 8 of the Uniform Commercial Code pertaining to investment securities. Ill.Rev.Stat. 1969, ch. 32, par. 768(c).

In examining the aforementioned provisions we believe that form should not take precedence over substance and the economic realities attributable to these two classes should be recognized. (See *Tcherepnin v. Knight, 389 U.S. 332, 336, 19 L.Ed.2d 564,569, 88 S.Ct. 548.*) Basically, permanent reserve shares are risk capital and function as protection for withdrawable capital accounts. The latter, by Illinois statute, enjoy hybrid characteristics, for they possess some of the attributes of an investment security and all of the essential elements of a withdrawable deposit in a bank upon default of the association.

These accounts are, by definition, withdrawable, subject only to the limitations imposed by section 4—13. (Ill.Rev.Stat. 1969, ch. 32, par. 773.) Furthermore, the standard Apollo passbook issued to account holders stated that "you may save or withdraw in any amount." Also borrowers or other obligors of the association are considered members and are entitled to voting privileges. Ill.Rev.Stat. 1969, ch. 32, pars. 741, 742.

In *People ex rel. Barrett v. Logan County Building and Loan Ass'n, 369 Ill. 518, 529,* the court, after examination of the pertinent section of the act governing the association, stated that insolvency occurs when the association is unable to fully meet the demands of its members, without regard to its inability to pay outstanding debts. The pertinent part of the provision construed in *Logan County* is analogous to section 7—8(b) of the I.S.L.A. (Ill.Rev.Stat. 1969, ch. 32, par. 848(b)) which describes, in part, several situations in which custody of the association may be taken. In contrast, an ordinary corporation is deemed insolvent when it is "unable to pay its debts as they

become due in the usual course of its business." (Ill.Rev. Stat. 1969, ch. 32, par. 157.2–15.) It is therefore manifest that the concepts of withdrawability, the extension of voting rights to borrowers and the necessary consideration for determination of insolvency are not generally characteristic of equity stock.

Moreover, in *In re Estate of Morey, 38 Ill.2d 575,* we held that a share certificate in a savings association possessed the attributes of a withdrawable capital account rather than a share of ordinary corporate stock. Implicit in that decision is the recognition that a withdrawable capital account differs from ordinary corporate stock.

Federal tax provisions also require that dividends payable to withdrawable capital account holders are treated in the same manner as interest paid by banks. These payments are deductible in computing the association's taxable income. (Int. Rev. Code of 1954, sec. 591.) Correspondingly, the dividends received by an account holder are treated as ordinary interest income and are not eligible for a dividend exclusion. Int. Rev. Code of 1954, sec. 116(c).

Objectors, however, assert that cases decided under the I.S.L.A. clearly establish that holders of withdrawable capital accounts are shareholders, not creditors. Prime reliance is placed upon *Tcherepnin v. Knight, 389 U.S. 332, 19 L.Ed.2d 564, 88 S.Ct. 548.* It is objectors' position that *Tcherepnin* is dispositive of FSLIC's contention that holders of withdrawable capital accounts enjoy a hybrid status of shareholder-creditor.

However, after analysis of *Tcherepnin* we find objectors' reliance misplaced. The narrow question for decision there was "whether a withdrawable capital share in an Illinois savings and loan association is a 'security' within the meaning of the Securities Exchange Act of 1934, 48 Stat. 881, 15 U.S.C. sec. 78a *et seq.*" (389 U.S. 332, 19 L.Ed.2d at 567.) The court therein concluded that it was "totally irrelevant to that narrow question of statutory

construction that these petitioners, if they are successful in their federal suit, might have rights in the limited assets of City Savings [a corporation doing business under the I.S.L.A.] superior to those of other investors in that Association." (389 U.S. 332, at 346.) *Tcherepnin* did not involve a disposition of the right of withdrawable capital account holders to post-default interest payable from liquidated surplus and is not persuasive support for objectors' position.

Objectors further rely upon *Federal Savings and Loan Insurance Corp. v. Huttner (7th cir.), 401 F.2d 58,* and *Marshall Savings and Loan Association v. Henson, 78 Ill.App.2d 14.* In *Huttner* the Court of Appeals held that FSLIC was not obligated to pay a dividend to insured members of a savings association which would have become payable during the final month of the association's operation, for the dividend had not been properly credited to the members' accounts prior to custody being taken of the institution which amounted to rescission of the dividend resolution. In *Henson* the appellate court held that FSLIC assumed the voting rights of account holders upon payment of insurance. In neither case was the present issue before those courts.

It is further urged by objectors that applicable constitutional and statutory prohibitions preclude treating savings and loan account holders as depositors in a bank. To support their contention that such classification is unconstitutional they cite *Gorham v. Hodge, 6 Ill.2d 31.* We note, however, that the withdrawable capital accounts did not initially constitute a receipt of deposit, as in *Gorham,* and to this extent that case is distinguishable. Similarly, the statutory provision upon which they base their objection (Ill.Rev.Stat. 1969, ch. 16½, par. 146) is equally inapplicable.

In the present case we agree with objectors that the provisions of the I.S.L.A. are of paramount importance in determining whether withdrawable capital account holders

in an Illinois savings and loan association may attain creditor status or whether they remain mere shareholders and as such are precluded from receiving interest upon default by Apollo.

Objectors assert that section 4—13(f) of the I.S.L.A. (Ill.Rev.Stat. 1969, ch. 32, par. 773(f)), which provides, "The holder of withdrawable capital for which application for withdrawal has been made, does not become a creditor by reason of such application," is conclusive. After examination of section 4—13(f), we find it is not intended to totally deprive holders of withdrawable capital accounts of creditor status during liquidation of the association. Section 4—13 generally establishes a method of voluntary withdrawal of capital funds during operation of the association where current funds may not be sufficient to meet all withdrawal requests. Subsection (f) is merely designed to prevent a holder of a withdrawable capital account who has requested withdrawal from thereby obtaining a preference for payment over other holders of withdrawable capital accounts if funds are not available to meet withdrawal demands. See *Gibson v. Safety Homestead and Loan Ass'n, 170 Ill. 44; Chapman v. Young, 65 Ill.App. 131.*

This conclusion is further supported by the pertinent sections of the I.S.L.A. pertaining to distribution of association assets by the receiver during involuntary liquidation as in the present case. (Ill.Rev.Stat. 1969, ch. 32, par. 921 *et seq.*) Section 10—5 (par. 925) provides that the receiver shall publish notice so as to inform all claimants against the association, including creditors and association members, that they should notify the receiver of their claims. Section 10—6 (par. 926) establishes the order of distribution to said claimants, providing that claims having preference in law will receive preference in payment. This section further provides that "No distribution shall be made on claims for capital until such preferred creditors have been paid ***."

The aforementioned sections clearly indicate that holders of withdrawable capital accounts may be claimants of the association (par. 925) though their claims are subordinate to those of "preferred creditors" (par. 926) during involuntary liquidation. However, if these account holders are never to be treated as creditors, as objectors contend, then the term "preferred" is meaningless and mere surplusage because there would be no class of nonpreferred creditors. If the term "preferred creditors" is strictly construed then the status of holders of withdrawable capital accounts is similar to that of general creditors of the association. The former interpretation is not favored. (*Hirschfield v. Barrett, 40 Ill.2d 224, 230; People ex rel. Barrett v. Barrett, 31 Ill.2d 360, 364-65.*) The latter is inconsistent with distribution preferences afforded creditors of other corporate entities. (See *Gulf Lines Connecting R.R. of Ill. v. Golconda Northern Ry., 290 Ill. 384, 392; Mott v. Danville Seminary, 129 Ill. 403, 410.*) The most logical interpretation is that the claims of outside creditors of the association are to be paid in accordance with any preference which they attain by law amongst their class while account holders attain the position of junior creditors of the association for payment of their claims.

Other jurisdictions have broadened the classification of the nature of a withdrawable capital account to extend beyond that of a mere share in the association. (See *Mengele v. Christiana Federal Savings and Loan Association of Wilmington (Del. 1972), 287 A.2d 395; Family Savings and Loan Association Shareholders' Protective Committee v. Stewart, 241 Md. 89, 215 A.2d 726; Benton's Apparel, Inc. v. Hegna, 213 Minn. 271, 7 N.W.2d 3; In re Pacific Coast Building-Loan Association, 15 Cal.2d 134, 99 P.2d 251.*) While these cases are not factually similar to this cause, they uniformly recognize that the characteristics attendant to an ordinary account in a savings association permit the account holder to attain a

status of more than mere shareholder in an association under varying circumstances.

Having examined the pertinent sections of the I.S.L.A., we find no explicit provision which prohibits the holders of withdrawable capital accounts or their assignees from attaining creditor status upon default of the association. As previously noted, various distinctions exist between the characteristics of these accounts and ordinary corporate stock which, we believe, militate against affording them similar treatment.

Under the provisions of the I.S.L.A. holders of withdrawable capital accounts or their assignees attain a hybrid status of shareholder-creditor upon default of the association. These account holders have been deprived of the use of their funds and profits produced therefrom during the liquidation proceedings, and they are entitled as creditors to interest for its use.

We now come to the manner of preference to be given to payment of these interest claims in distribution of assets during the receivership. Section 10–6 (par. 926) of the I.S.L.A. provides that preferred creditors shall be fully compensated before payment of claims for capital. It is manifest from this provision that the right of the withdrawable capital account holders is subordinate to those who enjoy preferred creditor status. A comparison of the characteristics of withdrawable capital accounts and permanent reserve shares further indicates that the former should attain a preference in payment *vis-a-vis* the claims of the permanent reserve shareholders. Consequently, as creditors, the holders of withdrawable capital accounts or their assignees are entitled to interest at the statutory rate commencing from the date of Apollo's default, which interest is to be provided only from liquidated surplus on a *pro rata* basis. Should this amount satisfy their claims for interest, the excess shall be distributed as provided by law.

To facilitate disposition of this matter upon remand, we further direct that the holders of insured withdrawable

capital accounts receive interest upon their accounts from the date of default by Apollo until payment by FSLIC.

Since the aforementioned is dispositive of this cause we need not consider the other issues presented. The judgment of the circuit court of Cook County is reversed and the cause remanded with directions to proceed in accordance with the views herein expressed.

*Reversed and remanded, with directions.*