JOHN J. LANIGAN, Comm'r of Savings and Loan Associations, Plaintiff, *v.* APOLLO SAVINGS, Defendant.—(DANIEL J. DONAHUE *et al.*, Shareholder-Appellants, *v.* FEDERAL SAVINGS AND LOAN INSURANCE CORPORATION, Receiver-Appellee.)

First District (4th Division)   No. 77-920

Opinion filed September 7, 1978.

Thomas A. Reynolds, Jr., Kurt L. Schultz, and David A. Genelly, of Winston & Strawn, of Chicago, for appellants.

Michael F. Duhl and Michael E. Phenner, both of Hopkins, Sutter, Mulroy, Davis & Cromartie, and Merrill Shepard and John J. O'Malley, all of Chicago (Pope, Ballard, Shepard & Fowle, of counsel), for appellee.

Mr. JUSTICE ROMITI delivered the opinion of the court:

This is another in a series of appeals concerning the liquidation of Apollo Savings and Loan, a liquidation which began over 10 years ago. The prior decisions are found in *Lanigan v. Apollo Savings* (1972), 52 Ill. 2d 342, 288 N.E.2d 445 (*Lanigan* I); *Lanigan v. Apollo Savings* (1975), 30 Ill. App. 3d 781, 332 N.E.2d 591 (*Lanigan* II); and *Lanigan v. Apollo Savings* (1976), 40 Ill. App. 3d 927, 353 N.E.2d 239, *appeal denied* (1976), 64 Ill. 2d 596 (*Lanigan* III).

■■■ The basic issue in this case is whether the court properly allowed the receiver's plan for final liquidation, providing for the payment in full

of all creditors but denying the stockholders any recovery. The stockholders contended that if final liquidation were delayed for 10 years there would be enough money to pay them as well. The creditors in such event would receive only the principal owed them plus 5 percent uncompounded interest thereon and no interest on the accrued interest which already has been owed them for several years. We hold that both Illinois law, as reflected in the prior *Lanigan* cases, and equity demand that the creditors be paid immediately and that the stockholders not receive the windfall of using the money owed to the creditors without paying a fair return for that money. We also agree with the trial court that since there is at present no surplus, the stockholders are not entitled to any part of the distribution. We also agree that there is nothing improper in Federal Savings & Loan Insurance Corporation (FSLIC) as receiver selling remaining assets (mortgages) to FSLIC as major creditor at a higher price than the receiver could obtain on the open market. Finally, we reject certain objections made by the appellants to experts' testimony since it is immaterial to these proceedings whether FSLIC-creditor intends to retain or sell the mortgages once it has purchased them from the receiver.

In general, the relevant facts in this case are undisputed. Until April 8, 1968, Apollo Savings and Loan transacted business on Michigan Avenue in Chicago. On that date FSLIC issued a cease and desist order prohibiting Apollo from paying a scheduled dividend because of the latter's seriously impaired financial condition. On April 26, 1968, plaintiff, Justin Hulman (then Commissioner of Savings and Loan Associations of the State of Illinois), issued an order taking custody of Apollo pursuant to section 7—8 of the Illinois Savings and Loan Act (Ill. Rev. Stat. 1969, ch. 32, par. 848), and appointed a receiver for the purpose of liquidating Apollo. The order stated that custody was taken because "the association was unable to continue operations," and that "an emergency existed which might have resulted in loss to the members or creditors of the association." On the same day Apollo's directors adopted resolutions consenting to the Commissioner's order. Thereafter, on May 2, 1968, the Commissioner instituted these proceedings and the circuit court of Cook County entered an uncontested decree of liquidation finding that "sufficient cause existed on April 26, 1968, and still exists for the custody, liquidation and dissolution" of Apollo.

Apollo was an insured institution within the meaning of the National Housing Act. (12 U.S.C. §§1724(a) and 1726.) The appointment of a receiver constituted a "default" (12 U.S.C. §1724(d)), and FSLIC was thereby required to pay insurance to Apollo's account holders. 12 U.S.C. §1728(b).

In return for the payment of insurance, each account holder delivered to FSLIC an assignment providing in part, as follows:

> "In consideration of the payment of insurance on said insured account, claimant hereby * * * (b) assigns, transfers and sets over to the Corporation [FSLIC] all of claimant's right, title and interest in and to said insured account * * *. It is understood that this assignment does not convey the assignor's interest in uninsured funds."

Pursuant to these assignments and the applicable provisions of the National Housing Act (12 U.S.C. §§1728(b) and 1729(b), (c)(1)), FSLIC became subrogated to the rights of the insured account holders in the assets of Apollo.

The originally appointed receiver resigned on September 30, 1968, and on the next day the State Commissioner appointed FSLIC as the receiver. This appointment was proper under the National Housing Act (12 U.S.C. §1729(c)), and section 10—1 of the Illinois Savings and Loan Act (Ill. Rev. Stat. 1967, ch. 32, par. 921).

Besides the insured depositors, 589 depositors had on the date of default accounts exceeding the then applicable insurance limit of $15,000. These uninsured depositors had principal claims against Apollo in excess of $1,000,000. The principal amount outstanding has since been reduced to $191,939 but they are owed $1,057,628 in post-default interest.

The objectors to the liquidation are certain stockholders of Apollo. As the courts in both *Lanigan* I and *Lanigan* II pointed out, while a very few of these objectors purchased their stock before liquidation at par value, the vast majority did not. There are 617,433 permanent reserve shares of Apollo outstanding with a par share value of $1 per share. On April 8, 1968, Edward P. Kelly, chairman of the board and chief executive officer, controlled approximately 80 per cent of the reserve shares. His control was exercised through Transcontinental Insurance Agency, the record owner. Most of this stock was pledged as collateral on a note and was sold on or after May 16, 1972, for 15 cents per share, Transcontinental having defaulted on the note. In an attempt to reap "windfall profits," as the court in *Lanigan* II characterized it, these stockholders attempted to persuade the court in *Lanigan* I to rule that the depositors were not entitled to post-default interest. This attempt was unsuccessful. Later, in another attempt to reap unwarranted profits out of a speculative investment, they attempted to persuade the court in *Lanigan* II to bar distribution for a few years so that sufficient funds could be generated from the mortgages to pay the permanent reserve shareholders the par value of their shares. Again they failed. These same stockholders are now back, trying to persuade this court that we should delay final distribution

for 10 years so that sufficient funds can be generated from the mortgages to pay the permanent reserve stockholders between $5.1 and $6.9 million (between about $8.26 and $11.18 a share), or if liquidation be ordered now, that they should receive the present value of that figure which they fix to be between $7.50 and $9.10 a share. We are no more convinced that they should receive such a "windfall" at the expense of the creditors than were the previous courts.

In moving on June 29, 1976, over two years ago, for authorization to sell the remaining assets of the receivership and for final distribution, FSLIC proposed to purchase in its individual capacity (not as receiver), all the real and personal property of the receivership. In consideration for the transfer of such assets it agreed to:

> 1. pay immediately the full amount of the principal due and claimed by the uninsured depositors (and of course to itself);
>
> 2. pay immediately the full amount of post-default and interim interest due to the uninsured depositors (and to itself);
>
> 3. assume and pay when due all valid claims against and debts and liabilities of Apollo except, of course, the claims of the shareholders since there was no surplus.

While the objectors produced considerable evidence in their attempt to defeat the petition, neither side seems to be in serious dispute, either as to the amount of the debts or the present value of the assets. According to the shareholders' exhibit the liabilities as of December 31, 1976, were:

| | |
|---|---:|
| Pending Claims | |
| Uninsured Depositors (Principal) | $ 191,939 |
| FSLIC (Principal) | 7,061,640 |
| Post-Default Interest | |
| Uninsured Depositors | 1,057,628 |
| FSLIC | 16,624,152 |
| Escrow Accounts | 838,352 |
| Claim for Improvements on Real Estate Held for Development | 326,687 |
| Miscellaneous Accounts Payable | 269,902 |
| Shareholders' Equity | 598,867 |
| | $26,969,167 |

The claim for improvements on real estate held for development was in litigation and its validity was not conceded by the receiver. Other claims in litigation at the time of the petition were:

1. Certain claims in re-
   ceivership proceedings                                    $  426,156
2. A claim to certain real
   estate—valuation not
   given
3. Counterclaim of Grizaffi and
   Falcone in FSLIC, *Receiver
   v. Kelly, et al.*                                          1,500,000
4. Village of Wood Dale claim in
   receivership proceedings                                     325,000
5. *Dunteman v. Blecke*                                           5,000
6. Claim for pre-default dividend                             1,349,000
   This last has since been
   resolved against the claimants
   (see 40 Ill. App. 3d 927,
   353 N.E.2d 239).

The assets, according to the shareholders' own exhibits, are:

| | |
|---|---:|
| Mortgage Loans | $20,717,313 |
| Real Estate Sold on Contract | 808,273 |
| Real Estate Held for Development | 1,545,500 |
| Real Estate Owned | 41,603 |
| Cash | 92,759 |
| U.S. Government Investments | 3,631,234 |
| Accrued Interest on Investments | 39,707 |
| Miscellaneous Assets | 92,778 |
| | $26,969,167 |

Both the witnesses for the petitioner and for the objectors agreed that if the mortgages must be sold at the present time, and of course they must before any final distribution can take place, they must be discounted somewhere between 13 and 20 percent. Discounting the book value of the mortgage portfolio and real estate sold on contract by 15 percent and increasing the market value of the real estate held for development to its appraised fair market value of $1,800,000 (the appellants contest none of these valuations on appeal), Apollo's assets at their fair market value as of December 31, 1976, were:

| | |
|---|---:|
| Mortgage Loans | $17,609,716 |
| Real Estate Held for Development | 1,800,000 |
| Real Estate Sold on Contract | 687,032 |
| Real Estate Owned | 41,603 |
| Cash | 92,759 |
| U. S. Government Investments | 3,631,234 |
| Accrued Interest on Investments | 39,707 |
| Miscellaneous Assets | 92,778 |
| MARKET VALUE OF ASSETS | $23,994,829 |

In other words, assuming all claims still in litigation were denied, the assets still are over $2,000,000 less than the liabilities. There was and is no surplus. It is in light of this simple fact that we must view the shareholders' contentions that they are entitled to share in the distribution of the assets—indeed, that they are entitled to between $4,630,747.50 and $5,618,640.30 of the amount available for distribution.

In general, the evidence introduced by the objectors was not presented to rebut any evidence of the petitioner but to show that if the mortgages were not sold, and were retained until maturity, presumably in about 10 years, there would be enough funds both to pay off the creditors and to give the shareholders between 5.1 and 6.9 million dollars. We may note that under their proposal the repayments to the creditors would be applied first to principal still owed so that after the third year, when the principal would be totally repaid, no interest would be accruing on the millions still unpaid. Despite this obvious fact, the shareholders contend that the creditors would not be injured by this delay in the payment of the amount owed since they would receive it in the end.

Both the absurdity and inequity of the shareholders' arguments are apparent merely from a narration of the facts. But, in any event, their contentions have all been answered in the prior *Lanigan* cases, and the rulings in those cases are binding both on the parties, as being the rule of the case, and on the court, as being the law of Illinois.

### I.

As we said above, a simple consideration of the facts reveals that all of the creditors will be injured by a further delay in the final distribution of Apollo's assets. The appellants argue that it has not been established that FSLIC would sell the mortgages once it received them and reinvest the funds at a higher rate than the 5 percent uncompounded interest

which FSLIC and the uninsured depositors will receive upon completion of the liquidation, since its ability to invest is affected by Federal regulations. Even if this were true, common sense shows that the uninsured depositors would be seriously injured by the delay. Advertisements abound touting the merit of various savings and loans plans, some short term, some long, all offering higher interest than 5 percent, all interest compounded. The uninsured depositors are owed $191,939 on which they will eventually be paid 5 percent interest; they are also owed $1,057,628 for the use of which funds they will receive not a cent of interest. Assuming that both amounts were paid today, that they were put in a simple savings and loan passbook account paying 5¼ percent interest yearly but compounded daily, at the end of 10 years that amount would earn approximately $862,000 in interest. The depositors under the shareholders' plan for the retention of their funds for 10 years could at most receive the sum of $95,969.50 in interest, and in fact would receive less than $28,790.85 since the objectors would pay off all principal owed by the end of the third year and no interest is paid on the interest owed. It was for this reason, among others, that the court in *Lanigan* II refused to delay a partial distribution of Apollo's assets, pointing out at 30 Ill. App. 3d 781, 786, 332 N.E.2d 591, 595:

> "The objectors contend that sufficient funds would be generated in 22 months to pay the permanent reserve shareholders the par value of their shares in addition to payment in full to the FSLIC. The receiver predicts, however, that to earn that amount of surplus could take 4 or 5 years, and possibly as long as 8 years. *Any delay approaching this estimation would be inconsistent with the predominant rights of creditors over those of stockholders and it would run counter to the purpose of the receivership which is to liquidate the association in a prompt and orderly fashion. Furthermore, the delay in the distribution of assets would be detrimental to the FSLIC and other creditors to the extent that they could earn a higher rate of return on those funds than the uncompounded 5% interest they now receive through the receivership.*" (Emphasis added.)

In addition, the uninsured depositors would be injured in another way as well. People invest in savings accounts to have money which, while drawing interest, is readily available for necessary expenditures. For 10 years the depositors have been denied the use of the money; the appellants would deny that use until at least 1986. The depositors may be forced to borrow at high interest rates because the money, while theirs, is not available; or they may even be unable to obtain needed money.

It is clear, therefore, that the creditors are injured by any further delay in final liquidation. While the delay would, admittedly, benefit the shareholders, we cannot favor the stockholders over the creditors.

*Lanigan v. Apollo Savings* (1975), 30 Ill. App. 3d 781, 332 N.E.2d 591.

As the court in *Lanigan* II pointed out, the goal is to complete liquidation as soon as possible so that the depositors can be paid. We recognize, as did the trial court, that liquidation has already been delayed, perhaps unnecessarily, in part simply because the receiver failed to seek the final liquidation despite the trial court's urging. That, however, is no reason to delay it further.

The appellants' argument that the problem of preferring stockholders to creditors could be cured by immediately paying all creditors except FSLIC is patently without merit since the court in *Lanigan* II, in response to precisely the same contention, ruled that FSLIC is subrogated to the rights of the insured withdrawable account holders in the assets of Apollo and has the right to be treated equally with the other creditors.

## II.

It follows, therefore, that the trial court correctly ruled that Apollo's assets should be sold now and liquidation completed. The stockholders argue, however, that they are entitled to be paid an amount of money equal to the present value of their statutory right to receive the balance of the funds in the estate after all of Apollo's creditors have been paid. We agree that they are entitled to receive the present value of their stock out of any surplus. However, there will be no surplus once the creditors are paid in full. The appellants also argue that FSLIC has shown no reason why it should succeed to the residual value of the estate when it paid nothing for the stock interest; or why the persons who have sued Apollo but have not yet proved their claims have any greater equitable right than the stockholders to participate in Apollo's assets. They complain that FSLIC's plan, despite its claims to treat all claimants equally, confers greater benefit on various classes of creditors but provides nothing for the shareholders.

In making these contentions, the appellants ignore the clear rulings of *Lanigan* I that:

> 1. preferred claimants, that is persons other than depositors, having claims, must be paid before either the depositors or the shareholders;
> 2. the depositors have a preference in payment vis-a-vis the claim of the shareholders and must be paid in full before any excess can be distributed to the shareholders.

As the court in *Lanigan* II pointed out:

> "The objectors must realize that the permanent reserve shares of stock function as secondary reserves out of which losses are paid when all other available reserves have been exhausted and that such stock is not withdrawable until all liabilities of the association have been satisfied in full. (Ill. Rev. Stat. 1973, ch. 32, par. 763.)

Permanent reserve shares are basically risk capital and function as protection for withdrawable capital accounts. (*Lanigan v. Apollo Savings.*) The receiver could not equate the interests of the owners of such shares with those of the withdrawable account holders who attained the status of creditors upon the default of the association." 30 Ill. App. 3d 781, 785-86; 332 N.E.2d 591, 595.

As to the rights of FSLIC, as we have already noted, *Lanigan* II ruled that it is subrogated to the rights of the insured depositors and must be treated equally with them.

The appellants have not denied that if the assets were sold at the present time on the open market, they would be sold at a loss. The receiver would receive about $23,994,829, over $2,000,000 less than the amount needed to pay off all claims of creditors, even if we ignore the claims still in litigation. FSLIC, in effect, is offering to pay between $26,043,613 and $28,000,000 or $29,000,000, depending on the validity of the claims still in litigation. Obviously, it is to the benefit of all of the creditors, including the uninsured depositors, that the latter offer be accepted. But FSLIC's offer still does not provide a surplus out of which the shareholders could be paid, and neither this court nor the trial court has any right to demand that a would-be purchaser offer to buy assets of a bankrupt corporation at a higher price than it is willing to offer, particularly when that price is, as here, much higher than any which could be obtained elsewhere, and is not otherwise shown to be unfair.

The appellants complain that it is unfair that FSLIC should get a profit from the mortgages, assuming that it retains them until their maturity. But the appellants have shown no way in which the price offered is unfair and, considering that it is so much higher than what could be obtained had FSLIC not made the offer, it is difficult to see how it could be considered unfair. As the court in *Lanigan* III ruled at 40 Ill. App. 3d 921, 931-32, 353 N.E.2d 239, 244:

"[Intervenors] contend that it is a breach of duty for FSLIC to 'line its pockets' with the portion of the surplus which it claims. It appears, however, that during this lengthy liquidation FSLIC has functioned well within the spirit and letter of the statutory authority by which it is governed. The claims of the insured account holders were promptly paid. The portion of the surplus claimed by FSLIC has been generated by the funds of FSLIC and the uninsured depositors which have been held by the receivership pending resolution of the numerous problems encountered in winding up the liquidated process. See *Lanigan v. Apollo Savings* (1975), 30 Ill. App. 3d 781, 332 N.E.2d 591.

While the FSLIC is directed to act 'to the best interests of the insured members of the association in default' (12 U.S.C.

1729(b)(5)), the agency is obliged only to give the account holders what is legally owed them. The mere existence of a surplus does not give the account holders legal rights to it. It is not a breach of duty for the FSLIC to claim its fair share of the surplus. Cases have held that the Federal Deposit Insurance Corporation, the sister agency of FSLIC, as assignee of insured bank depositors has been entitled to a portion of post-default interest when a surplus occurs. (*Federal Deposit Ins. Corp. v. Citizens State Bank of Niangua* (8th Cir. 1942), 130 F.2d 102; *Wilhoit v. Federal Deposit Ins. Corp.* (6th Cir. 1943), 143 F.2d 14.) The reasoning of these cases, stressing the preservation of that agency's solvency and the protection of public monies, is equally applicable to the FSLIC. Thus intervenors have demonstrated no breach of duty by FSLIC during the liquidation proceedings."

Likewise, the appellants here have demonstrated no breach of duty by FSLIC during the liquidation proceedings. Even assuming that, as the stockholders contend, Apollo's mortgages are virtually certain to pay between $28,000,000 and $30,200,000 over the next ten years to their owners, any profit would be but a small return on the over $26,000,000 which FSLIC is, in effect, paying out to purchase the mortgages and other assets, even without considering the cost of managing the portfolio.

The cases cited by the appellants for the proposition that a receiver cannot make a profit from the receivership are not in point. FSLIC here is not only the receiver, it is also the major creditor and, as the court ruled in *Lanigan* III, as major creditor is entitled to claim its fair share of the surplus.

### III.

The appellants also contend that the trial court erred in allowing expert evidence based on an assumption that FSLIC would sell the mortgages on an open market and then invest the proceeds in government bonds yielding 7.4 percent, although there was no evidence that FSLIC intended to sell them. Whether FSLIC, once it purchases the mortgages, intends to sell them or retain them is irrelevant to the question whether the receivership should be wound up. The only issue was and is whether the creditors would suffer a detriment if forced to wait 10 years. It is clear that they would; and that any profit received by the shareholders would be at the creditors' expense, contrary to the law of Illinois.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

DIERINGER and LINN, JJ., concur.